THE LONG ISLAND RAILROAD COMPANY, Appellant and Respondent, v. DEPARTMENT OF LABOR OF THE STATE OF NEW YORK et al., Respondents and Appellants.

THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, Appellant and Respondent, v. DEPARTMENT OF LABOR OF THE STATE OF NEW YORK et al., Respondents and Appellants.

(Argued May 13, 1931; decided June 2, 1931.)

*Alfred A. Gardner, Louis J. Carruthers* and *Joseph F. Keaney* for Long Island Railroad Company, appellant and respondent. Article 8-A of the Labor Law cannot be sustained upon the principle that the State may determine for itself and its municipalities the hours required and rates of wages which it and they will pay. (*Atkin* v. *Kansas,* 191 U. S. 207; *People ex rel. W. E. & C. Co.* v. *Metz,* 193 N. Y. 148; *Campbell* v. *City of New York,* 244 N. Y. 317; *Adair* v. *United States,* 208 U. S. 161; *Coppage* v. *Kansas,* 236 U. S. 1.) The act cannot be sustained upon the theory that it comes within the police power of the State. (*Wilson* v. *New,* 243 U. S. 332; *Tyson & Bro.* v. *Banton,* 273 U. S. 418; *People ex rel. W. E. & C. Co.* v. *Metz,* 193 N. Y. 148; *Adkins* v. *Children's Hospital,* 261 U. S. 525.) The Legislature by characterizing grade crossing work as public work cannot bestow upon itself the power to fix hours of labor and rates of wage for the workmen employed by the railroad companies and their contractors in carrying out such work. (*People* v. *Crane,* 214 N. Y. 167; *McFarland* v. *American Sugar Co.,* 241 U. S. 79; *Manley* v. *Georgia,* 279 U. S. 6.) The statute is void for indefiniteness. (*General Construction Co.* v. *Connally,* 3 Fed. Rep. 666; *Webster* v. *Fall,* 266 U. S. 507; *New* v. *Oklahoma,* 195 U. S. 252; *Tefft, Weller & Co.* v. *Munsuri,* 222 U. S. 114; *United States* v. *More,* 3 Cr. 159; *The Edward,* 1 Wheat. 261; *Connally* v. *General Construction Co.,* 269 U. S. 385; *Campbell* v. *City of New York,* 244 N. Y. 317; *Small Co.* v. *American Sugar Refining Co.,* 267 U. S. 233; *Standard Chemicals Corp.* v. *Waugh Chemical Corp.,* 231 N. Y. 51; *Cline* v. *Frink Dairy Co.,* 274 U. S. 445.) Article 8-A of the Labor Law, in so far as it attempts to regulate the hours of service, wages and working conditions of the railroad's employees, is in conflict with the

commerce clause of the Federal Constitution. (Hours of Service Act, U. S. Code, tit. 45, §§ 61–64; Railway Labor Act, U. S. Code, tit. 45, §§ 151–163; *Texas & N. O. R. Co.* v. *Railway Clerks*, 281 U. S. 548; *Erie R. R. Co.* v. *New York*, 233 U. S. 671; *People* v. *New York Central*, 163 App. Div. 79; *Staten Island Rapid Transit Ry. Co.* v. *Public Service Comm.*, 16 Fed. Rep. [2d] 313; *People ex rel. Delaware & Hudson Co.* v. *Public Service Comm.*, 226 App. Div. 43; *Napier* v. *Atlantic Coast Line*, 272 U. S. 605; *Missouri Pacific* v. *Porter*, 273 U. S. 341; *Dollar Co.* v. *Canadian C. & F. Co.*, 220 N. Y. 278; *People ex rel. Angerstein* v. *Kenney*, 96 N. Y. 302; *McFarland* v. *American Sugar Co.*, 241 U. S. 79.)

*Austin J. McMahon* and *Douglas Swift* for Delaware, Lackawanna and Western Railroad Company, appellant and respondent. The statute, in so far as it attempts to regulate hours of service, wages and working conditions of the railroad's employees, is in conflict with the commerce clause of the Constitution. (*Pedersen* v. *D., L. & W. R. R. Co.*, 229 U. S. 146; *Philadelphia, Baltimore & Wash. R. R. Co.* v. *Smith*, 250 U. S. 101; *Lombardo* v. *Boston & Maine R. R. Co.*, 223 Fed. Rep. 427; *Houston & Texas Ry. Co.* v. *United States*, 234 U. S. 342; *Southern Ry. Co.* v. *Railroad Comm. of Indiana*, 236 U. S. 439; *Southern Ry. Co.* v. *United States*, 222 U. S. 20; *Colorado* v. *United States*, 271 U. S. 153; *People ex rel. D. & H. R. R. Co.* v. *Pub. Serv. Comm.*, 226 App. Div. 43; *Texas & N. O. R. Co.* v. *Railway Clerks*, 281 U. S. 548; *St. L. & I. M. S. Ry.* v. *Edwards*, 227 U. S. 265; *Erie R. R. Co.* v. *New York*, 233 U. S. 671; *Savage* v. *Jones*, 225 U. S. 501; *Whish* v. *Public Service Comm.*, 205 App. Div. 756; 240 N. Y. 677; *Staten Island Rapid Transit Ry. Co.* v. *Pub. Serv. Comm.*, 16 Fed. Rep. [2d] 313.) Congress has taken over the field of wages and hours of service of all employees of interstate carriers. (*Wilson* v. *New*, 243 U. S. 332; *Texas & N. O. R. Co.* v. *Railway Clerks*, 281 U. S. 548.) The power of Congress to make

regulations in regard to agencies for interestate commerce is not defeated by the fact that some of its necessary incidents when considered alone are of non-interstate character. (*Gibbons* v. *Ogden*, 9 Wheat. 187; *Welton* v. *Missouri*, 91 U. S. 275; *Northern Securities* v. *United States*, 193 U. S. 197; *Texas & N. O. R. Co.* v. *Railway Clerks*, 281 U. S. 548; *Stafford* v. *Wallace*, 258 U. S. 495; *Interstate Commerce Comm.* v. *Goodrich Transit Co.*, 224 U. S. 194; *Dayton-Goose Creek Ry.* v. *United States*, 263 U. S. 456; *Texas & Pac. Ry. Co.* v. *Rigsby*, 241 U. S. 33; *Second Employers' Liability Cases*, 223 U. S. 1.)

*John J. Bennett, Jr., Attorney-General* (*Hamilton Ward, Frank P. Walsh, Claude T. Dawes, Wendell P. Brown* and *Amos D. Moscrip* of counsel), for Department of Labor et al., respondents and appellants.  Article 8-A of the Labor Law does not violate any provision of the Federal Constitution.  The State may regulate the wages and hours of labor of persons engaged in public work. (L. 1897, ch. 415; L. 1899, ch. 567; L. 1900, ch. 298; L. 1906, ch. 506; L. 1909, ch. 292; L. 1913, ch. 494; L. 1916, ch. 152; L. 1921, ch. 642; L. 1927, chs. 166, 563; L. 1930, ch. 804; *Campbell* v. *City of New York*, 244 N. Y. 317; 277 U. S. 573; *People ex rel. Williams Eng. & Cont. Co.* v. *Metz*, 193 N. Y. 148.)  The work of grade crossing elimination is public work; a railroad is a public highway and a railroad corporation is an agent of the State.  (*Olcott* v. *Supervisors*, 16 Wall. [U. S.] 678; *Beekman* v. *Saratoga & S. R. Co.*, 3 Paige, 45; *Bloodgood* v. *Mohawk & H. R. Co.*, 18 Wend. 1; *Worcester* v. *Railroad Co.*, 4 Metc. 564; *Charles River Bridge Co.* v. *Warren*, 7 Pick. 495; *Sun Pub. Assn.* v. *Mayor*, 152 N. Y. 257; *Matter of Niagara Falls R. R. Co.*, 108 N. Y. 375; *People* v. *Kerr*, 27 N. Y. 188; *Clarke* v. *City of Rochester*, 24 Barb. 446; *Chicago R. R. Co.* v. *Chicago*, 140 Ill. 309; *White River Turnpike Co.* v. *Vermont Cent. R. Co.*, 21 Vt. 590; *Cherokee Nation* v. *So. Kan. R. Co.*, 135 U. S.

641; *People* v. *N. Y. C. R. R. Co.*, 28 Hun, 543.) The statute is not vague or indefinite. (*Connally* v. *General Constr. Co.*, 269 U. S. 385; *Case* v. *State of New York*, 254 N. Y. 568.) The statute is not subject to attack because of its penalty provisions. (*Rail Coal Co. v. Yaple*, 236 U. S. 338; *Portland R. R. Co.* v. *Portland*, 230 U. S. 525; *Wadleigh Southern R. Co.* v. *Georgia*, 235 U. S. 651; *St. Louis R. R. Co.* v. *Arkansas*, 240 U. S. 519.) The trial court erred in holding that the Railway Labor Act made inoperative the provisions of article 8-A of the Labor Law as to railroad employees engaged in grade crossing elimination. (*Adkins* v. *Children's Hospital*, 261 U. S. 525; *Munn* v. *Illinois*, 94 U. S. 113; *O'Gorman* v. *Hartford Assurance Co.*, 282 U. S. 251; *New York Central R. R. Co.* v. *Williams*, 199 N. Y. 108; *Erie R. R. Co.* v. *Williams*, 199 N. Y. 525; *Howard* v. *Illinois C. R. R. Co.*, 207 U. S. 463; *Houston Ry. Co.* v. *United States*, 234 U. S. 342; *Southern Ry. Co.* v. *United States*, 222 U. S. 20; *Baltimore & Ohio R. R. Co.* v. *Interstate Commerce Comm.*, 221 U. S. 612; *New York Central R. R. Co.* v. *Carr*, 238 U. S. 260; *Erie R. R. Co.* v. *Collins*, 253 U. S. 77.)

*Frederick L. Hackenburg* and *Frank Pedlow* for District Council of New York City of United Brotherhood of Carpenters and Joiners of America, *amicus curiæ.* The elimination of grade crossings is public work within the meaning of article 8 and article 8-A of the Labor Law. (*McAvoy* v. *New York*, 52 App. Div. 485; *U. S.* v. *Ætna Indemnity Co.*, 40 Wash. 87; *Matter of New York Central R. R. Co.*, 136 App. Div. 760; *Matter of Boston R. R. Co.*, 64 App. Div. 257; 170 N. Y. 619; *People* v. *Kerr*, 27 N. Y. 188; *Missouri, K. & T. R. R. Co.* v. *Oklahoma*, 271 U. S. 303; *Erie R. R. Co.* v. *Board of Public Utility Commrs.*, 254 U. S. 394; *Transit Comm.* v. *Long Island R. R. Co.*, 253 N. Y. 345.) Article 8-A of the Labor Law does not abridge the privileges and immunities of plaintiffs nor deprive the plaintiffs of their property without due process of law nor deny to the plaintiffs

the equal protection of the laws and does not violate the Fourteenth Amendment of the Constitution of the United States nor sections 1 and 6 of article 1 of the Constitution of the State of New York. (*Atkins* v. *Kansas,* 191 U. S. 207; *People ex rel. W. E. & C. Co.* v. *Metz,* 193 N. Y. 148; *Muller* v. *Oregon,* 208 U. S. 412; *Campbell* v. *City of New York,* 244 N. Y. 317.) Article 8-A is neither vague, uncertain nor indefinite and the standard therein set is capable of ascertainment. (*Campbell* v. *City of New York,* 244 N. Y. 317; *Case* v. *State of New York,* 254 N. Y. 568.) Article 8-A does not in any respect interfere directly with or burden interstate commerce and is not in conflict with clause 3 of section 8 of article 1 of the United States Constitution. (*Erie R. R. Co.* v. *Board of Public Utility Commrs.,* 254 U. S. 394.) Article 8-A is not in violation of, nor in conflict with the Hours of Service Act, the Railway Labor Act. (*Chicago & N. W. R. Co.* v. *Railroad Warehouse Comm.,* 280 Pac. Rep. 387; *N. Y. C. R. R. Co.* v. *White,* 243 U. S. 188; *Raymond* v. *C., M. & S. R. Co.,* 243 U. S. 43; *M. & S. L. R. Co.* v. *Winters,* 242 U. S. 353; *Buyonfski* v. *Lehigh Valley R. R. Co.,* 228 N. Y. 248; *Shanks* v. *D., L. & W. R. R. Co.,* 239 U. S. 556; *C., B. & Q. R. R. Co.* v. *Harrington,* 241 U. S. 177; *Matter of Otterstadt,* 234 N. Y. 203; *Klochyn* v. *N. Y. C. R. R. Co.,* 218 App. Div. 295.)

LEHMAN, J. The State has determined that dangerous railway crossings at grade should be eliminated from the highways of the State. To promote that work the People of the State have adopted a new section of the Constitution which permits legislative authorization of a debt or debts of the State not exceeding in the aggregate three hundred million dollars " to provide moneys for the elimination, under State supervision, of railroad crossings at grade within the State, at the expense of the State, railroad companies, counties and cities, as hereinafter provided. Of the expense of a grade crossing elimi-

nation to which any of the proceeds of such a debt are applied, fifty per centum shall be borne by the railroad company." (Art. VII, § 14.) The Legislature has authorized the creation of such a debt, and has, by chapter 678 of the Laws of 1928, provided for the elimination of grade crossings outside the cities of New York, Buffalo and Syracuse, and, by chapters 677, 679 and 825 of the Laws of 1928, has provided for such elimination within those cities. The machinery set up for the " supervision " by the State of the work to be done is not identical in all these statutes. In the city of New York the railroad company is required to perform the entire work, while elsewhere, at least in the absence of other direction, the railroad company performs the work " exclusive of the approaches " and the State or a civil subdivision thereof performs the work " relating to the approaches." In all cases the railroad company is required to pay only one-half of the cost of the work. The remainder of the cost is borne by the State or county.

Before these statutes were adopted, we had said that " the public policy of the State declared by successive Legislatures during a period of thirty years * * * exacts the payment of the rate of wages prevailing in the vicinage to laborers and mechanics employed upon public works." (*Campbell* v. *City of New York*, 244 N. Y. 317, 324.) There we considered and sustained provisions of the Labor Law which regulated the hours of work of laborers, workmen and mechanics and required payment to them of " not less than the prevailing rate for a day's work," etc., upon " public works." The term " public works " was limited in the statute to work performed by, or under a contract with, " the state or a municipal corporation or a commission appointed pursuant to law," and of course this court used that term in the same sense. By chapter 804 of the Laws of 1930, the Legislature has added a new article to the Labor Law (Cons. Laws, ch. 31), regulating in similar manner the hours of work and

the wages of laborers, workmen and mechanics upon "all work of every kind upon the elimination of railroad grade crossings under article seven, section fourteen of the constitution * * * for the cost of which work the state and/or its civil divisions is liable in any proportion." Such work is by the statute "declared to be public work for the state and/or for its civil divisions."

The Long Island Railroad Company is a corporation, created by the State of New York and operating a railroad in this State. The Delaware, Lackawanna and Western Railroad Company is a corporation, created by the State of Pennsylvania and operating railroad lines in the State of New York, which are owned or leased by it, pursuant to authority conferred upon it by the Legislature of this State. Both companies, in the operation of their railroad lines, are engaged in interstate commerce. These lines, at many places, cross public highways at grade. The State has directed the elimination from its highways of some of these crossings. It will in the future direct the elimination of others. The railroad companies, claiming that the enforcement of the provisions of article 8-A of the Labor Law upon any work performed by them in accordance with the directions of the State, in the elimination of grade crossings, would constitute a violation of their constitutional rights, have brought these actions to enjoin such enforcement.

Even though the railroad companies must pay one-half the expense of the work done by the State, or a civil division thereof, upon the approaches or other parts of crossing elimination, the plaintiffs do not contend that as to such work the provisions of the statute are invalid or unenforceable. By amendment to the Constitution of the State in 1905, it was expressly provided that "the Legislature may regulate and fix the wages or salaries, the hours of work or labor, and make provision for the protection, welfare and safety of persons employed by

the State or by any county, city, town, village or other civil division of the State, or by any contractor or subcontractor performing work, labor or services for the State, or for any county, city, town, village or other civil division thereof." (Art. XII, § 1.) In *Atkin* v. *Kansas* (191 U. S. 207, 222) the Supreme Court of the United States decided that the exercise of such power by the State violated no right of a municipality or of a contractor which was guaranteed by the Constitution of the United States, saying " we can imagine no possible ground to dispute the power of the State * * * that no one undertaking work *for it or for one of its municipal agencies*, should permit or require an employee on such work to labor in excess of eight hours each day." The amendment of 1905 destroyed all vestiges of an earlier doctrine that the exercise of such a power could constitute an invasion of the constitutional rights of a municipality or other civil division of the State. (*Campbell* v. *City of New York*, *supra*.) It was intended to do no more. It precluded further assertion of the existence of a limitation upon the control of the State over municipal corporations or other civil divisions of the State. It removed any restrictions which the State might, by its own Constitution, have imposed upon the exercise of a power which was not restricted by the Federal Constitution. It could not remove the restrictions imposed by the Federal Constitution for the protection of subjects of the State, and it did not by implication limit the exercise of any powers which the Legislature had previously enjoyed. The railroad companies maintain that they are not civil divisions of the State, or even agents of the State, in performing the work of elimination of grade crossings. If that contention is sound, then we must look elsewhere for any legislative power to regulate the hours of work and wages of workmen on those parts of the work of grade crossing elimination performed by the railroads under command of the State.

The work of eliminating railroad crossings at grade from the highways of the State is, doubtless, public work. It is a " public undertaking in behalf of the * * * people of this State, * * * in which the railroads are to pay a part of the cost." (*Transit Commission* v. *Long Island R. R. Co.*, 253 N. Y. 345, 350.) " It is elementary that for the safety and convenience of the public, the State, either directly or through its municipalities, may reasonably regulate the construction and use of highways where they cross railroads. The legitimate exertion of police power to that end does not violate the constitutional rights of railroad companies. They may be required at their own expense to construct bridges or viaducts whenever the elimination of grade crossings reasonably may be required, whether constructed before or after the building of the railroads." (*Missouri, Kansas & Texas Ry. Co.* v. *Oklahoma*, 271 U. S. 303, 307; *Atchison, Topeka & Santa Fe Ry. Co.* v. *Railroad Commission*, 283 U. S. 380.) The State might, if it saw fit, do the work itself, and when the railroads in obedience to the command of the State perform the work of changing a highway grade they are in fact performing a function intrusted to them by the State. (*Fries* v. *N. Y. & Harlem R. R. Co.*, 169 N. Y. 270; *Transit Commission* v. *Long Island R. R. Co.*, *supra.*)

Even though all this be true, the railroad companies when acting under the direction of the State are not, in true sense, its agents. They act under compulsion of the State in the performance of an obligation they owe to the State. Though, to the extent necessary to perform that obligation, they must be intrusted with State powers and functions, yet in all else they are acting for themselves, and not as representatives of the State. Towards third parties they may at times be cloaked by the State with the same immunity which the State would enjoy if the State did the work itself (*Fries* v. *N. Y. & Harlem R. R.*

*Co., supra*); yet their relations to the State are in no wise those of principal and agent. The cost and burden is theirs, and theirs alone, except to the extent that the State chooses to relieve them of that burden.

The declaration of the Legislature that such work is " public work for the state and/or for its civil divisions " cannot alter the facts or enlarge the legislative power. (*People* v. *Crane*, 214 N. Y. 154, 167.) The actual facts that the work is public and performed under the supervision of the State upon highways of the State for the benefit of the people of the State, and in part at the cost of the State, are doubtless sufficient basis for the exercise of the power of the Legislature to regulate the performance of the work in order to promote the public welfare, and even the public convenience, in the use of the highways to which the highways are dedicated. On the other hand, the fact that the work is performed by corporations which are neither subdivisions of the State nor in full sense agents of the State, but are entitled to the protection of the Fourteenth Amendment of the Federal Constitution against invasion by the State of their rights to liberty and property, restricts, in some degree, the exercise of that legislative power of regulation. The problem in this case is whether the Legislature has transcended those restrictions.

Doubtless the police power of the State does not extend generally to the regulation of the hours of labor or the wages to be paid for work performed within its borders in accordance with the views of one school of social thought or another. Even where such work is clothed with a public interest, the State's power of regulation is not unlimited. The regulation must tend reasonably to advance that interest. " The power to regulate property, services or business can be invoked only under special circumstances; and it does not follow that because the power may exist to regulate in some particulars it exists * * * in all." (*Tyson & Brother* v. *Banton*,

273 U. S. 418, 429.) There the court, after reviewing the decisions where price regulation has been sustained, stated that they " turned upon the existence of conditions, peculiar to the business under consideration, which bore such a substantial and definite relation to the public interest as to justify an indulgence of the legal fiction of a grant by the owner to the public of an interest in the use." (*Tyson & Brother* v. *Banton*, 273 U. S. 418, 438.)

In truth, when the courts indulge in legal fictions, it is difficult to define the conditions which justify the fiction or the limits to which the fiction may be carried. At best, these fictions are merely a form of explanation for the decision of the courts. The decision must be dictated by the facts in each case, and not by any fiction or set formula. In some work and business, the interest of the public is so great that the public welfare may require the State to interfere in the conduct of the work or business, by regulations which tend reasonably to protect or conserve the interest of the public. Here the interest of the public is so direct and substantial that there can hardly be doubt that the State may, at least in some measure, regulate the work which the railroads have been commanded to perform. The difficulty lies in determining the question of whether the statute is a reasonable exercise of that power.

We are not, in this case, called upon to attempt definition of the power of the State to regulate the conduct of the affairs of corporations maintaining railways in the State, either because the railway lines are themselves in some sense " highways " of the State or because the State has reserved a power to amend the charters of such corporations. The problem here is simpler. The control of the State over its own highways is almost, if not quite, plenary, and the work which the railways have been commanded to perform is work on the highways of the State. Railway crossings at grade upon these highways are dangerous. The State, as we have shown,

has concededly the right to order the railways to remove the danger. Concededly, too, the State has the right to determine the manner in which the railways shall be carried across the highways of the State. The State is directly interested in preventing all unnecessary or dangerous obstructions in the highway, whether such obstructions are permanent or merely temporary, while work is being performed upon the highways. It may cause or permit the railroads to do work upon the public highway, but its duty towards the people to keep the highway free from unnecessary obstructions or dangers is not interrupted nor its power abdicated while that work is proceeding. A regulation which tends to promote the efficient and uninterrupted performance of work performed under command of the State, to carry out an obligation owed to the State, upon a highway of the State, is not unreasonable and beyond the power of the State. We need not here resort to any legal fiction. The railroad companies operating the railway lines in fact knew that they were under a duty to the State to eliminate highway crossings upon the highways of the State and were subject to the commands of the State which reasonably tend to promote the use of the highways of the State.

That brings us to the question of whether the provisions regulating hours and wages are reasonable. Perhaps the provision that no workman should be permitted or required to work more than eight hours a day, if standing alone, might have only a remote bearing upon the speed and efficiency of the work. We do not now decide whether such a provision would be valid. (See *Wilson* v. *New*, 243 U. S. 332.) Here provisions as to hours of work and that for such a day's work the workman should receive at least the rate of wages prevailing in the locality are inextricably intertwined. Together these provisions insure that hours and pay should not fall below the standards which are commonly accepted by workmen and employers. Our problem is whether the Legislature

had power to impose such standards upon this form of public work.

It seems to a majority of the court that these standards are reasonable and violate no constitutional rights of the railroad companies. Opposing views may be urged in regard to the question of whether short hours and high wages tend to produce more efficient work. Within the limits of its regulatory power over this form of public work, the Legislature may decide such questions — the courts have no such power. Generally wages and hours of work are fixed by the law of supply and demand. The workman will seek to obtain work at the highest wages and under the best conditions which he can command; the employer will seek to obtain men who will do his work at the lowest cost to him. It follows that, at least in times where there is no extraordinary unemployment, the workmen who will work for more than eight hours a day at a rate of wages less than the rate prevailing in the same trade or occupation in that locality are men who lag behind others in skill and efficiency, and cannot command the same wages as they receive. A regulation that all workmen shall be paid for a day's work of eight hours not less than the rate of wages prevailing in the locality where the work is performed is at least some assurance that the workers employed will not be drawn from the least skillful group. Then, too, such a regulation is some assurance that the work will not be interrupted and delayed by labor unrest. The laborer who is paid at the prevailing rate of wages for a day's work of eight hours has more to lose if discharged and less to gain if he seeks work elsewhere, than one who receives a wage less than the majority of workers receive.

We recognize that, perhaps, some of the work requires no skill or training, and could be performed as well by men brought from other localities who are willing to work long hours at low wages. But for the provisions of the statute, the company would be free to determine for

itself whether it should adopt the policy of employing the cheapest labor it can obtain in the cheapest market or the policy of paying at least as much as the average workman would receive in the locality where the work is to be done. The railroad company might even be willing to assume the risk that the employment of poorly paid laborers would cause unrest and consequent delays and interruptions in work performed for the public benefit upon public highways. To that extent the Labor Law may increase the cost of the work and the burden of the railroad company; but it seems to us that such an increased burden cannot be regarded as unreasonable when balanced against the advantage to the State of having the work performed under conditions which give some assurance that the work will be completed without interruptions or delay by workmen of average skill. To secure that advantage for the State, the Legislature had the power to impose the increased burden upon the railroad company.

Even if these considerations are deemed insufficient to justify the State in imposing the regulations upon the work, the court is unanimous that such regulations would still be a valid exercise of the power of the State to determine the conditions upon which the moneys or credit of the State shall be used in meeting fifty per centum of the cost of the work. As we have said, the State might have directed the railroad to perform the entire work at its own cost. When it chose to bear half the cost itself, it might have imposed any conditions it saw fit. The constitutional amendment expressly provides that bonds may be issued only for elimination of crossings " under state supervision." The Legislature in enacting the Grade Crossing Elimination Acts, under which this work is proceeding, acted under the authority given by the constitutional amendments. The railroad companies have elected to accept the benefit conferred upon them in pursuance of the constitutional amendments.

They cannot, then, reject its burden. They have consciously subjected this work to "state supervision." The State is itself directing the work in accordance with the public interests which the State has a duty to conserve. Under its power of "supervision" it may direct that the work proceed in a manner that will reasonably tend to promote efficiency and diminish danger of delay and interruption. A narrower definition of the term "supervision" would defeat the purpose of the constitutional amendment. The statute which the railroad companies attack constitutes a valid exercise of the power of supervision.

We have not overlooked the contention of the railroad companies that the standard of wages to be paid is too indefinite for enforcement, at least until the "prevailing" rate has been determined by the proceedings authorized for that purpose in the statute. (*Connally* v. *General Construction Co.*, 269 U. S. 385.) We have considered a similar contention in *Campbell* v. *City of New York* (244 N. Y. 317). Much that we have said there is applicable in this case, though the problem presented is not in all its aspects the same. The Labor Law now defines how the rate of wages prevailing in a locality may be fixed. It may be difficult at times to obtain all the required data; there may, at times, be dispute as to the correctness of data used, but when reliable data has been obtained, the prevailing rate can be calculated with exactness. When that rate has been determined by order made by the authorized State officer, it cannot be contended that the standard of wages is in any degree indefinite. Until that time a railroad company or contractor is not subject to any penalty for failure to pay the statutory rate of wages. If before that order is made it may, in some instances, be impossible to determine with certainty what wages should be paid or received, the only disadvantage that the railroad company or contractor suffers is the possibility of mistake in determining the cost of

the work to be done and the difficulty of arriving at a fair figure for a contract for such work. Even so, the statute provides a definition which makes calculation of cost possible with a reasonable degree of certainty. Any remaining uncertainty in fixing costs in advance is a consideration which may affect the wisdom of the legislative action, but where the Legislature has power to decide, the courts may not consider the wisdom of its decision. Here the Legislature did have such power, and the statute is not too indefinite for enforcement in accordance with its provisions.

In our consideration of the validity of the statute, we have, up to this point, excluded from our consideration the question of whether the Legislature in regulating the work done by the railroads on highway crossings has invaded the field of interstate commerce assigned under the Constitution of the United States to Congress. The work upon the highways of the State is not in itself interstate commerce, and the burden placed upon the railroads, even though interstate carriers, cannot be said to be an unreasonable burden on interstate commerce. (See *Interstate Commerce Comm.* v. *United States*, 280 U. S. 52; *Atchison, Topeka & Santa Fe Ry. Co.* v. *Railroad Comm., supra.*) The railroad companies do not contend otherwise, but they maintain that in so far as the statute regulates the hours of work and the wages of employees of interstate carriers, the Legislature has invaded a field in which Congress has already assumed exclusive jurisdiction. Doubtless even though the work in which these employees are engaged is not interstate commerce, a regulation as to the hours they may work or as to the wages they are to be paid may at least indirectly affect interstate commerce. Congress by the Hours of Service Act (Mason's U. S. Code, tit. 45, ch. 3, §§ 61, 66) has regulated the hours of work of certain classes of employees of carriers engaged in interstate commerce and by the Railway Labor Act (Mason's U. S. Code, tit. 45, ch. 7-A, § 146) has provided a method

for adjusting disputes between interstate carriers and their employees concerning rates of pay. The question here is whether these acts so cover the field of the hours of labor and rate of wages of employees of interstate carriers that the State is entirely excluded from that field even for the purpose of regulating work which is not part of interstate commerce.

Where employees are engaged both in interstate and intrastate commerce, regulation of their hours of labor and their wages by congressional action shall be construed as an exclusion of the States from the same field. (*Erie R. R. Co.* v. *New York*, 233 U. S. 671.) The work of a carrier is for most purposes a unit, and it would hardly be feasible to segregate work in interstate commerce or the employees engaged therein from other work and employees. Excessive hours of labor performed in intrastate work may diminish the efficiency of a worker, thereafter employed in interstate commerce. Difference in wages paid to men doing the same grade of work for the same employer and even at times shifted from one form of work to another may create labor unrest which will affect interstate commerce. Congress may, therefore, assume exclusive jurisdiction in such matters.

There may be doubt whether Congress has regulated the hours of labor of any employees of the railway companies who might be used in grade crossing elimination. The Hours of Service Act applies only to a limited class of employees. We do not now decide whether the State may not regulate the hours of labor of other employees. (*Baltimore & Ohio R. R. Co.* v. *Interstate Commerce Comm.*, 221 U. S. 612, 621.) Here, as we have pointed out, the regulation of hours of labor is inextricably interwined with the regulation of rate of wages and they must stand or fall together.

The Railway Labor Act covers a broader field. It provides a method for fixing wages of employees by free contract or adjustment of labor disputes. It includes

as an employee subject to its provisions " every person in the service of a carrier   *   *   *   who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission." Its purpose of ending labor disputes may be thwarted by any regulation of the State compelling payment of wages to " employees " at a different rate.   It seems to us clear that Congress intended to exclude any interference by any State in the field of wages of employees of interstate carriers.   The Labor Law of this State may for these reasons not be applied to any " employee," as defined in the Federal act, where the carrier is directed to perform work by its own employees.   It is enforceable whenever the railroad company is directed to perform the work otherwise.

The judgment should be affirmed, without costs.

CRANE, J. (concurring).   When the railroads accepted the offer of State aid to the extent of sharing one-half of the cost of changing grade crossings, they also accepted the requirements of the State in connection with the doing of such work, except as prohibited by Federal regulations. This is fair and reasonable.   Interstate commerce is not restricted when the expense is less than it would be if the railroads had to pay the entire cost.

For this reason, I concur in the result.

CARDOZO, Ch. J., POUND, KELLOGG and O'BRIEN, JJ., concur with LEHMAN, J.; CRANE and HUBBS, JJ., concur in result in memorandum by CRANE, J.

Judgment affirmed.