## JOLIET AND CHICAGO RAILROAD COMPANY *et al.*

*v.*

## ROBERT H. HEALY *et al.*

1. NAVIGABLE STREAM—*of the "Healy slough."* The body of water in Cook county, in this State, connected with the south branch of the Chicago river, and known as the "Healy slough," is not a navigable stream, in the sense in which that term is used in the law, when applied to streams with capacity to bear the usual products as well as the commerce of the country in suitable vessels for transportation. So, the public have not an easement over the "Healy slough" of a character to render a permanent railroad bridge over the same a public nuisance.

2. CHANCERY—*will not require that to be done which will be unavailing.* But, without reference to the question of the rights of the public, or of riparian owners, in respect to the navigability of the "Healy slough," where it was sought by the owner of a lot of ground abutting upon the slough, by bill in chancery, to compel a railroad company to remove a permanent bridge it had erected over the same for railroad purposes, and to restore that body of water to its former condition, by constructing a draw-bridge or otherwise, so as not to impair its usefulness; and to enable complainants to avail thereof as a means of communication by vessels from the Chicago river to a canal or slip owned

by them, it appeared there was a space of ground, over which they had no control, intervening complainants' canal and the slough, which cut off the water connection, so that a swing-bridge over the slough, in place of the permanent bridge sought to be removed, would be of no avail to them for the purpose alleged. It was *held*, a court of chancery would not grant the prayer of the bill to do so useless an act as the removal of the permanent bridge, inasmuch as such action could result only in injury and expense to the railroad company without any corresponding advantage to the complainants.

3. Equity will not do that which will be of no benefit to the party asking it, and only a hardship upon the party coerced,—or, as the maxim is, the law does not require any one to do vain or useless things.

4. APPEAL FROM APPELLATE COURT—*whether decree appealed from is final.* Where the Appellate Court reverses the decree of the trial court, and remands the cause with specific directions as to what decree shall be entered, so that nothing remains to be done in the court below other than to carry into effect the mandate of the Appellate Court, the decision of the Appellate Court will be considered so far final that an appeal will lie therefrom to this court.

5. SAME—*finding of facts—whether conclusive on this court.* The provisions of the Practice act making the findings of fact by the Appellate Court conclusive on error or appeal to this court, have no application to chancery causes. In such cases this court will review the evidence as to facts found which constitute the basis of the decree.

APPEAL from the Appellate Court for the First District; the Hon. THEODORE D. MURPHY, presiding Justice, and Hon. GEO. W. PLEASANTS and Hon. JOSEPH M. BAILEY, Justices.

Mr. C. BECKWITH, and Mr. GEO. W. SMITH, for the appellants.

Mr. J. P. BONFIELD, for the appellees.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

This case has been elaborately argued in every phase it presents, but the view we have taken may be shortly stated. It is a bill filed by the owners of a lot abutting on what is called "Healy slough," and its object is to secure the removal of a permanent railroad bridge constructed by the Chicago and Alton Railroad Company over the body of water bearing that name. The theory on which the bill is framed is, that the body of water spanned by the bridge is navigable, in the

24—94 ILL.

sense that term is used in the law when applied to streams with capacity to bear the usual products as well as the commerce of the country in suitable vessels for transportation, and hence the public have an easement over it, and any obstruction therein becomes a public nuisance; and on account of the situation of complainants' property they insist they have sustained damage of a special and peculiar nature, which will enable them to bring the bill in their own name.

On the hearing in the circuit court the bill was dismissed for want of equity, but on the appeal of complainants to the Appellate Court that decree was reversed, with directions to the circuit court to decree in conformity with the prayer of the bill, and giving specific directions as to what decree should be entered.

As nothing remained to be done in the court below other than to carry into effect the mandate of the Appellate Court, an appeal has been brought directly to this court, and that, under the statute, is allowable, as it is a case in which an appeal lies to this court.

It is suggested that, as the Appellate Court must have found this body of water was navigable in fact, such finding is conclusive, under the statute, on this court; and on this branch of the case it would only remain to ascertain whether it was navigable in law.

We have had occasion frequently to say, and quite recently in *Fanning* v. *Russell, ante,* p. 386, the provisions in the Practice act making the findings of fact by the Appellate Court conclusive on error or appeal to this court, have no application to chancery causes, and that it is the duty of this court, as it was before the passage of that act, to review the evidence as to facts found which constitute the basis of the decree.

. The question made may be treated simply as a question of fact, viz: is the body of water spanned by the railroad bridge navigable, in the sense that term is used in the law? We think it is not. It will not be necessary, therefore, to consider when

a stream is deemed navigable in law, either at the common law or under the American decisions.

One allegation in the bill upon which the right to relief is based, is that the " Healy slough," so called, is a natural stream of water rising far to the south-west of the premises, running north-easterly toward the same, and, curving to the north, crosses Archer avenue in nearly a northerly direction, forms the westerly boundary of the premises, and empties into the south branch of the Chicago river,—the "Healy slough" being an arm branch and affluent of the south branch, and thereby connecting with the canal and with Lake Michigan, and being one of the navigable waters falling and leading into the St. Lawrence river through the Chicago river, Lake Michigan and other great lakes.

Another ground is, that the Joliet and Chicago Railroad Company, that originally constructed the road now operated by the lessee company, was obligated by its charter, whenever it became necessary to cross any water course in constructing its road, to restore such water course to "its former state, or in a sufficient manner not to impair its usefulness," and as the Chicago and Alton Railroad Company has succeeded under a perpetual lease to all the rights of the former company, the same obligation rests upon it in that respect. But as it does not appear either railroad company has done anything to impair the usefulness of the water course other than to construct the bridge across it, which does not materially change it from its former state, the injury will be narrowed to the consideration of the first ground of relief mentioned.

Plats found in the record show with sufficient distinctness the situation of complainants' land, the location of the railroad bridge with reference to the water course crossed, and the length of the slough from its confluence with the river to the bridge on Archer road. These are matters of measurement mostly, about which there can be no disagreement. The ancestor of complainants, in 1837, acquired a right of pre-

emption to lot 6, block 1, in the canal trustees' subdivision of the south fractional part of section 29, except one-half acre of equal width across the north side of lot 6, owned by Hough, and one lot on Lime street, south of Hough's tract, fifty feet wide by one hundred feet deep, owned by Stevens, as more definitely appears on the plat attached to the bill; and in 1855 he obtained a deed from the trustees by which he acquired the title in fee to the property now owned by complainants. The lot or piece of land described lies between the railroad bridge and the bridge on Archer road. Both of these bridges, as now constructed, are permanent structures. Archer road was laid out by the canal trustees in 1836, before complainants' ancestor had obtained any interest in the land they now own, and was indicated on the plat made by them, which was on record. It is now a principal street in the city of Chicago, and is called Archer avenue. It is south of the railroad, and the distance between the two bridges is about two hundred and eighty-five feet. From the railroad bridge north to the junction of the slough with what is called the south branch of the Chicago river, is about three hundred and eighty-two feet. All the land on either side of the slough, north of that owned by complainants' ancestor was platted into lots by the canal trustees and sold to other parties, but it was mostly owned by Brainard, Evans and the Houghs.

The original track of the railroad was constructed across lands owned, at the time, by Daniel Brainard and John Evans, under a special agreement made March 12, 1858. By that the owners granted to the railroad company a right of way eighteen feet wide, across lots by them respectively owned, on condition the railroad company would construct and maintain two swing draw-bridges,—one across a slip or canal to be excavated between lots two and three, and the other across a similar slip or canal to be excavated near the east line of lot one, both to be so constructed as to admit the easy passage of vessels. The east end of lot one rests on the

" Healy slough." The railroad company complied with that agreement, and constructed swing draw-bridges at both points indicated.

After the incorporation of the Chicago and Alton Railroad Company, and after it became the owner of the privileges and property of the Joliet and Chicago Railroad Company, the former company made separate agreements with Brainard and Evans, by which each of them released the railroad company from the obligation to maintain a swing draw-bridge across the slip or canal to be excavated at the east end of lot one, and each conveyed to the company twelve additional feet of ground on the south side of the right of way first granted, making the entire right of way thirty feet wide. These releases and additional conveyances were upon conditions that were complied with. Afterwards, in 1865, the railroad company removed the old draw or swing bridge and erected the present permanent structure on their own right of way, as they insist.

The evidence as to the character of the body of water called the " Healy slough " is only conflicting as to the depth of the water it contained in its natural state. As to its width and length there is not much disagreement. Its average width is from 75 to 100 feet, and its length does not much exceed one-half mile. Witnesses do not agree in their definitions of it. Some designated it as a " stream," others as an " arm " of the south branch, others as a " bayou " of the south branch, as the Chicago river, so called, is itself a bayou of the lake, and one witness speaks of it as an " estuary." It is certain it is not a " stream," as that term is usually understood. It is fed by no springs or small streams having any permanent or continuing source. Originally it did, and it may yet, receive the usual drainage of the adjacent country at its head—the quantity, of course, depending on the rainfall. A " stream " involves the idea of a current. This slough never had any current unless affected by high waters, or the rise and fall of the river as it was affected by the lake. It had no flow of water from its

head.   No matter what name is given to it,—whether it is called a "bayou," an "arm," a "stream," a "branch," an "affluent," or an "estuary,"—it is simply a depression, or basin, in the adjoining land filled with water from the south branch, as that is filled with water from the lake.   The depth of water in it always depended on the water in the river, and the depth of the water in the river was higher or lower as the lake rose or fell.   That fact has given rise to the contradictory testimony given.   All the witnesses agree that the depth of the water in the river is affected by the winds off the lake, and perhaps other causes, and the difference at times is very considerable.   That light-draft freighting vessels did make trips up the slough as far as the stone quarry, south of where Archer bridge is now situated, is proven, but that it was ever navigable for the usual vessels in any carrying trade is not proved.   The boating that was done there was confined principally to one brief season, and that was before the Archer bridge was erected.   The weight of the testimony is, that this slough was never navigable, even for the vessels of light draft, as the term navigable is usually understood in this country. As early as 1836, State, or Archer, road was laid out under the authority of State officers, and a permanent bridge erected where it crosses the slough.   Since then it is not claimed that vessels of any kind have passed the bridge.

There were a number of sloughs similar to the "Healy slough" on the south branch, and all of them spanned by bridges on the tow-path.   Most of them have since disappeared.   In 1848 a bridge was built over the "Healy slough," at its junction with the river, for a tow-path for the use of the canal.   It was continued about a year, and was then removed—not because it obstructed a navigable "stream" or body of water, but because other means were adopted to tow in canal boats.   Considering the length of the slough and the depth of the water it usually contained, it can not be maintained that the public ever acquired an easement over it as on a highway on a navigable stream bearing the products of the

vicinity and the commerce of the country at large. Neither the action of the State officers, when the State was the sole proprietor of the lands on both sides of the slough, nor the action of the original riparian owners, is consistent with any such theory. They treated it as private property, as it was. Since it has been dredged and excavated between the railroad bridge and the river, vessels may enter and depart, but never before, except very light draft vessels, and then, no doubt, under the most favorable circumstances, when the water was unusually high on account of the action of the lake. It does not appear that in the original survey the borders of the slough were meandered, as would doubtless have been done had it been considered a navigable body of water by the government surveyors. Since it has been excavated by the riparian owners, it is as much private property as any slip or canal excavated upon other lands adjacent to the river would be, and there could be no easement over it in favor of the public.

There is another view that may be taken. The evidence in this case warrants the same conclusion that was reached in *Schœneman's case*, 90 Ill. 258. Substantially the same testimony was submitted in both cases. It was there said: "The evidence shows that the canal, or slip, excavated by Brainard and Hough from the river south, does not extend to the right of way of the railroad, so that if the excavation which appellees have made south from the right of way should be extended north through the right of way, it would not then reach the canal, or slip, on the north, but there would be a space of ground intervening which appellees have no right to intermeddle with. They would have no continuous canal, or slip, to the river, and theirs would be useless, and the construction of a swing or draw-bridge would be of no benefit to them."

It is distinctly made to appear there is not now a continuous canal, or slip, from the river south to Archer road, navigable for vessels of any description, if the railroad bridge were out of the way; and as Brainard and Hough bound

themselves, in their agreement with the railroad company, that their slip should not be excavated farther south, it is not probable there will be any canal, or slip, constructed that would give complainants ingress and egress to and from the river; and of what avail, then, would a swing-bridge be to complainants, should the railroad company be compelled to establish and maintain one where their permanent bridge now is? .

As we have seen, without excavation vessels could not pass over the strip of land between the right of way and the Brainard and Hough slip; and as that is private property, complainants may not intermeddle with it. A swing-bridge at the point indicated would not serve any useful purpose, so far as now appears, and would be a great detriment to the defendants. Equity will not do that which will be of no benefit to the party asking it, and only a hardship upon the party coerced, or, as the maxim contained in the old books is, the law does not require any one to do vain and useless things.

The decree of the Appellate Court will be reversed, and the cause remanded with directions to affirm the decree of the circuit court dismissing the bill for want of equity.

*Decree reversed.*